## Staunton.

### TULEY v. BARTON.

#### September 25, 1884.

1. EVIDENCE—*Parol—General Rule.*—As a general rule, contemporaneous parol evidence is inadmissible to contradict or vary the terms of a valid written instrument.

2. IDEM—*Exceptions.*—But parol evidence is admissible to show additional independent facts contemporaneously agreed upon and not inconsistent with or contradictory of·the contract so far as reduced to writing. *Brent v. Richards*, 2 Gratt. 542.

3. IDEM—*Idem—Receipts.*—Receipts are either mere admissions of payments or delivery, or they may contain a contract to do something in relation to the thing delivered. So far as they are mere admissions of delivery, they are only *prima facie*, and may be contradicted by parol testimony. But so far as they are evidence of a contract, they stand on the footing of other written contracts.

4. IDEM—*Receipts—Liability of Attorney or Transferee.*—Attorney's receipt for claims for collection may be so far added to by parol testimony as to show a contemporaneous additional contract on the part of attorney to receive the claims as collateral security for debts due him from client. But the liability of attorney or transferee is only for the exercise of due diligence to collect those claims; and in neither capacity is he responsible for their loss, unless such loss. be occasioned by his negligence.

Appeal from decree of circuit court of Frederick county, entered June 23d, 1882, in chancery cause wherein Mrs. Mary W. Tuley was complainant and R. T. Barton, surviving executor of David W. Barton, deceased, and E. Holmes Boyd, trustee, were defendants.

In December, 1865, Mrs. Tuley purchased of David W. Boyd

a house and lot in Winchester, in said county, at the price of $7,000. Of this price she paid one-third in cash. For the residue, she executed her two bonds, which she afterwards, in May, 1868, secured by a deed of trust on the property to said Boyd, as trustee. Besides the cash payment, she had, when this suit was commenced, made various payments, together amounting to $2,775.07 on this debt. The trustee, by the direction of the surviving executor, advertised the property to be sold on 28th December, 1881. In the advertisement, he professed to state the amount of Mrs. Tuley's payments, but omitted one of $505, paid to the executor 11th January, 1881, but which he afterwards promptly admitted.

Mrs. Tuley obtained an injunction to the sale as advertised, on 15th October, 1881, from the judge of said circuit court. In her bill she set up this omitted credit of $505, and also that she was entitled to an additional credit growing out of the fact that in 1869 she had placed in the hands of said R. T. Barton, as her attorney, a claim due her on a negotiable note made by Trussel & Coburn for $2,003.92, with interest from 4th April, 1861, until paid, and endorsed by John H. Chrisman first, and afterwards by G. A. White, and also transferred this claim to said Barton, as executor of D. W. Barton, as collateral security for her debt on the purchase of the said property; and that by the dealings of said R. T. Barton with the said Trussel-Coburn claim, the same had, through his conduct in connection therewith, been wholly lost to her. For this claim she held his written receipt.

R. T. Barton answered her bill, promptly admitted her claim to the credit for $505, which he said had been accidentally omitted, and acknowledged that the Trussel-Coburn claim had been by her placed in his hands as an attorney for collection, with an understanding that when collected, it should be applied as payment on her indebtedness aforesaid; but wholly denied that she had transferred it to him as executor as collateral security therefor, and that he had in any respect, either by

omission or commission, dealt therewith in such a manner as to render her entitled to have credit for any part thereof on her said indebtedness, and set out in full detail all the circumstances connected with his receipt of that claim, and his efforts to collect it. Numerous depositions of witnesses were taken, and several records of suits relating to the prosecution of this claim were filed—a full statement of the main features whereof is essential to a comprehension of the case.

At the time the receipt of Mr. Barton for this claim was given, Mrs. Tuley did not have the Trussel-Coburn note in possession, but only a written memorandum thereof, the note being represented to be among the papers of the Farmers' bank at Winchester. Believing the note could be readily found, Mr. Barton executed his receipt by the memorandum, which turned out to be for a greatly larger sum than the note really was when long afterwards it was accidentally found.

On search, though repeatedly made, this note could not be found. Getting together such data as could be reached, Mr. Barton, for Mrs. Tuley, brought a suit in chancery to set up the lost note. This suit was in the circuit court of Frederick county, and at the November term thereof, 1869, the cause was heard, when, for want of sufficient proof as to John H. Chrisman, who had answered, denying liability and calling for proof, the bill was dismissed as to him, but at the same time a decree was rendered upon the bill taken for confessed against the said makers, who were and have since remained insolvent, and against said second endorser, G. A. White, then a man of large estate and supposed solvency.

From this time until 1881 there were numerous suits with unusual complications, all growing out of the litigation thus commenced about this claim. These various suits were prosecuted in the counties of Frederick, Clarke and Augusta, besides being repeatedly before this court on appeal; in all which Mrs. Tuley was actively represented by Mr. Barton as her attorney.

It is unnecessary here to go into all the details of these suits.

Suffice it to say, White obtained an injunction and gave bond, with M. G. Harman, of Augusta, as security, in the penalty of $3,000. Harman was a man of large property, but vastly involved.

The injunction was dissolved in June, 1870. Mrs. Tuley, in the meanwhile, brought a general creditor's bill against White, in Frederick county, and a similar suit was, during this term, being prosecuted against White in Rockbridge county. Seesawing between the two greatly complicated matters, and delayed the suit in Frederick at great costs. Real estate, in the meanwhile, became greatly depreciated, and when White's land was sold (the claim in question having been audited in both suits against him), only $150 of Mrs. Tuley's claim was realized.

Mr. Barton, for Mrs. Tuley, then, in 1874, brought suit on the injunction bond of White and Harman, and the latter, who was in failing circumstances, successfully delayed judgment. In this emergency a compromise was effected by which Harman, in satisfaction of his liability on said injunction bond, executed his note for the amount of the claim in question, with A. W. Harman as his surety, payable in one year.

Harman then filed a bill to be subrogated to the rights of White, his principal, against the estate of Chrisman, and got a decree to that end.

In the meantime, Mr. Barton, for Mrs. Tuley, got a judgment at law against Harman, when his note became due and was not paid, and subsequently, by a garnishee proceeding, obtained for Mrs. Tuley a judgment against Chrisman's estate as debtor to Harman by virtue of his said decree against said estate.

Thus there were two judgments against Chrisman's estate for one and the same debt. Chrisman's administratrix filed a bill of interpleader, on the hearing of which Mrs. Tuley's claim was rejected, and an appeal was taken in Mrs. Tuley's name, at the hearing of which the decree below was affirmed by this court.

Passing over many matters merely of detail, it is necessary only to further state that the debt due from Mrs. Tuley to the

estate of David W. Barton being secured on her home (the property for which her debt was created) by a trust deed to E. H. Boyd, trustee, and disagreement at this point of time, to-wit, 1881, springing up between Mrs. Tuley and Mr. Barton, respecting the claim now in controversy, the latter to test the matter as well as to protect the estate of David W. Barton, of which he was then sole executor, caused said trustee, E. H. Boyd, to advertise the property of Mrs. Tuley, being the house and lot on Market street, in the city of Winchester, mentioned in said trust deed, for sale; and in the advertisement by mistake a credit of $505 paid by Mrs. Tuley January 7th, 1881, was omitted.

Thereupon, Mrs. Tuley promptly obtained an injunction, restraining the sale of her property, and claiming in her bill not only the said credit of $505, but also a credit or an abatement of her debt to the estate of David W. Barton, by the amount of the said Trussel-Coburn debt, which she alleges she placed in the hands of Mr. Barton, not only as her attorney for collection, but as executor of said estate and as collateral security for a large debt she owed to said estate, the bonds evidencing which were held by said executor; that her Trussel-Coburn claim had been lost by the negligence of said executor in not promptly suing on said injunction bond, and that by reason thereof, the loss should be borne by said estate, and her debt thereto abated by that amount. Said executor answered, denying the claim *in toto*. At the hearing, the complainant's bill was dismissed at her costs, and from that decree the case is here on appeal. Other facts of the case are stated in the opinion.

*Richard Parker,* for the appellant.

*Barton & Boyd, W. L. Clark,* for the appellees.

RICHARDSON, J., after stating the case, delivered the opinion of the court:

In this case only two questions arise. They are these: 1st. Did the appellant place the Trussel-Coburn claim in the hands of R. T. Barton, executor, not only for collection by him as her attorney, but also as collateral security, as alleged? 2d. Were the costs, under the circumstances, properly adjudged against the complainant in the court below?

The first question is purely one of fact, to be found, however, subject to fixed rules of law; and in ascertaining what the fact is, we can be guarded only by the evidence.

It is not, and cannot be pretended that the receipt of R. T. Barton, attorney, imports anything other than the ordinary relation of counsel and client. It does not follow, however, that the receipt gives expression, or was intended to express the whole of the contract by which the parties intended to be bound.

Notwithstanding the unquestioned rule, as briefly stated in 1 Greenl. Ev. § 275, "that parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument," yet, in the nature of things, in its application to the measureless variety of circumstances attendant upon contracts, the rule is subject to many exceptions or relaxations; none of which exceptions, it is believed, mar either the beauty or strength of the rule in its general application, or affect its wisdom and binding authority. For the exceptions indicated, see *Towner* v. *Lucas' Ex'or*, 13 Gratt. 705, and the cases there cited. All of these cases hold that parol evidence will not be received to engraft upon, or incorporate with a valid written contract, an incident occurring contemporaneously therewith and inconsistent with its terms. In other words, no new words can be added, nor, when the meaning is clear and unambiguous, can any other construction be given than what the written words naturally import. But parol evidence is admissible to show additional independent facts, contemporaneously agreed upon and not inconsistent with or contradictory of the contract, so far as reduced to writing. Such was the case in *Brent* v. *Richards*, 2 Gratt. 542.

The rigor of the rule above stated seems to be still further re-
laxed in its application to *receipts* as contradistinguished from
contracts *"inter partes"* generally. In 1 Greenl. Evi. § 305, it
is said: "In regard to *receipts*, it is to be noted that they may
be either mere acknowledgments of payment or delivery, or
they may also contain a contract to do something in relation to
the thing delivered. In the former case, and so far as the re-
ceipt goes only to acknowledge payment or delivery, it is merely
*prima facie* evidence of the fact, and not conclusive; and, there-
fore, the fact which it recites may be contradicted by oral testi-
mony. But in so far as it is evidence of a contract between the
parties, it stands on the footing of all other contracts," &c. Now,
under the rule as thus stated and as applicable to the case in
hand, the receipt in this case is evidence that R. T. Barton, as
Mrs. Tuley's attorney, received the claims therein embraced for
suit and collection, and in that respect cannot be contradicted or
varied by oral evidence in conflict therewith; and had the receipt
gone further and expressed the additional fact that the claims
therein mentioned were also placed in the hands of Mr. Barton as
executor and accepted by him as collateral security for the debt
due the estate of his testator, the receipt, in that respect, would
be equally inviolable. But the latter fact not being so expressed,
does not preclude Mrs. Tuley from setting up, by parol, the fact
that he received that note as collateral for her said debt, and this
whether contemporaneous or subsequent, because it is not incon-
sistent with and does not even tend to contradict or vary the
terms of the receipt as written.

Now, what is the fact? Was the claim against Trussel &
Coburn placed in the hands of Mr. Barton as collateral secu-
rity? If so, was he invested with general discretionary powers
in respect to the management of same?

At the threshold of this inquiry we are met with a circum-
stance which necessarily involves in more or less of doubt and
obscurity the claim asserted by Mrs. Tuley against R. T. Barton,
as executor of the estate of David W. Barton. And that is, the

inconsistency of her statement made in her bill as compared with
that in her deposition; the latter being repeated in her petition
for appeal. In her bill the statement is, that having placed this
claim originally (December 2d, 1868,) in the hands of Mr.
Barton, as her attorney, for collection, that it was afterwards,
and after the institution of her chancery suit against G. A.
White, that she assigned and transferred the claim to Mr. Bar-
ton, as executor. (The chancery suit here referred to was the
chancery suit against White and others on the Trussel-Coburn
debt, and was brought in June, 1869.) In her deposition, with-
out any satisfactory explanation, she states and insists that
this transfer and acceptance took place at the time Mr. Barton's
receipt was given. At the time of receiving these claims, Mr.
Barton made entries of them in his "collection book," showing
that they were received for suit and collection, as set out in his
receipt. Immediately thereafter, suits at law were brought on
the claims other than the one here in controversy, and as to it a
chancery suit was brought in June, 1869, as before stated. All
of these proceedings, together with numerous others mentioned
in the statement of the case, were in Mrs. Tuley's name. Be-
sides, at the date of the execution of Mr. Barton's receipt, Mrs.
Tuley was not in the possession of the Trussel-Coburn note,
which was then lost and was not found until June, 1870. It is
next to incredible that Mr. Barton would, under the circum-
stances, have accepted this claim as collateral security, and thereby
take upon himself, as executor of David W. Barton, all the re-
sponsibilities of an equitable assignee, and this, when the debt
held by him as executor against Mrs. Tuley was amply secured
upon the property for which that debt was created. Many other
circumstances might be mentioned which tend to the same end.
It is, however, sufficient to say, that the conclusion, from all the
facts and circumstances, is irresistible that Mrs. Tuley is mis-
taken when she insists that contemporaneously with Mr. Barton's
receipt to her, she placed in his hands the Trussel-Coburn claim
as collateral security, and that he then accepted the same as
transferee.

Was there a subsequent arrangement in respect to this claim between Mrs. Tuley and Mr. Barton? and if so, what did it amount to? At least, as early as November, 1875, Mr. Barton gave Mrs. Tuley assurance that he regarded her debt as secure, and then reminded her that it had been assigned to him as collateral, to which she assented. Later, in the interpleader suit of Mrs. Chrisman, before referred to in respect to this claim, in one of the various forms of litigation through which it passed, Mr. Barton endorsed this claim for his benefit. This was in 1881.

On the 26th day of November, 1877, Mr. Barton wrote Mrs Tuley:

" DEAR MADAM :

"As soon after the court adjourns as I can, I will make out and send to you a full statement of all our business matters. We obtained a judgment against M. G. Harman, as surety for G. A. White, for about $2,000 (the large debt), which you assigned as collateral security for the debt you owe on the house. Mr. Ransom, of Staunton, has this matter in charge, but thus far has not been able to make the money. My account will only relate to one note collected for you from White, and which is all I am now able to make. On this I advanced you October 11th, 1870, the sum of $110, and the balance was paid out in costs and expenses of the long litigation, except the sum of $70 credited on your bond for the purchase of the house. This I gather roughly from a glance at the books. As soon as I can, I will make a detailed statement.

"Very truly, yours, &c.

"R. T. BARTON, *Attorney.*"

In a postscript to this note he says: "Please excuse my not sending you a note by the bearer in reply to yours. I was so much engaged at the time he came that I was unable to do so."

Again he wrote her :

" WINCHESTER, VA., *December* 27*th,* 1880.

" DEAR MADAM:

          " I send you herewith a statement of the amount due by you on your bonds for the purchase of the house on Market street. You will see by this settlement that the balance due at this date is $5,422.60. I could not distribute this money, and hence have not troubled you about it. I cannot now distribute it, and do not care to get the money at once, but the interest has accumulated so that the property itself can scarcely be considered a sufficient security for the debt. I must, therefore, ask you either to pay a part of the debt or to give me new bonds for it, including the interest, and with additional security. The Harman-Chrisman claims, which you transferred to me as collateral security, I have never been able to collect, but it is all in suit in the court of appeals, and I hope I may be able to collect it. Yet this, however, if we collect it all, would not be enough to pay the balance due on the house. Please give the matter your prompt attention, as I am compelled, as executor, to have it settled at once to the sufficient security placed in my hands. I do not care for any money now.

          " Very truly yours, &c.,

                 " R. T. BARTON."

These letters were produced in evidence by Mrs Tuley. They serve materially to explain the matter in controversy. It can hardly be denied that these letters, if standing alone, and especially if certain expressions therein were left unexplained by other circumstances, would be quite sufficient to establish that sometime subsequent to the date of the receipt of Mr. Barton the claim in question was accepted by him, as executor, as collateral security. But when looked to in the light of all the facts and circumstances disclosed by the record, they fall far short of establishing that fact. In fact the letters themselves, while they convey in legal language that idea, contain other

expressions which tend powerfully to explain that the language used, though employed by an intelligent and experienced lawyer, was either inadvertently used or not used in the strict legal sense which the words import.

It must be borne in mind that Mrs. Tuley's whole contention is that her claim was lost through the negligence of Mr. Barton in not prosecuting suit on the injunction bond executed by G. A. White, with M. G. Harman as surety, at an earlier date than it was done, and when, as she claims, her debt could have been made; though of this it may here be said there is no evidence in the record.

The injunction was dissolved in June, 1870. Suit was brought on the bond in May, 1875, in Augusta county. During all this period Mrs. Tuley's claim, in different forms, was being vigorously prosecuted, and in several different courts. Chrisman, the first endorser, had been discharged in 1869 for want of proof, and without any fault of Mr. Barton, the note and evidence of dishonor, &c., protest, being lost. But at the same time Mr. Barton, as counsel for Mrs. Tuley, had obtained a decree against White, the second endorser, and then commenced the long line of suits and complications already referred to, in all of which Mr. Barton most energetically prosecuted Mrs. Tuley's claim. In this interval he even obtained a judgment by a proceeding by garnishment against Chrisman's estate, which was afterwards lost it is true, and the claim of Mrs. Tuley taken to this court, where the decree below against her was affirmed. This was, however, no fault of his, and instead of evidencing negligence, shows persistent effort in her behalf.

During nearly all of this period of alleged *laches*, Mr. Barton, as he positively states in his deposition, had the utmost confidence that his decree against White, a man of large estate, made Mrs. Tuley's claim perfectly good. This is all that could be expected. He was not required to use, nor would he have been justified in using an extravagant diligence, which to all appearances could only impose unnecessary costs of litigation

upon his client. In this belief Mr. Barton was fully justified; for, notwithstanding the long and wasteful litigation, the enormous costs, and the fearful depreciation of real estate, brought about, no doubt, by the financial distress of that period, Mrs. Tuley's claim was reached and in part ($150) paid; all of which was faithfully accounted for.

Under such circumstances, even if Mr. Barton had been the equitable assignee in the strictest sense, he certainly could not as executor, or otherwise, be saddled with this loss. His diligence was fully up to the requisite standard in such case; and no human foresight could probably have foreseen and guarded against the loss which occurred. If even as much—certainly nothing more was required than was performed.

Again, Mrs. Tuley, as disclosed by the record, gave Mr. Barton the widest range of discretion in the management of this claim; such as in *Smock* v. *Dade,* 5 Rand. 639, was called *"general discretionary* powers," which in the nature of things must protect one where the trust imposed is performed in good faith; and there is no pretense here that Mr. Barton did not act *bona fide.* Mr. Barton did much not required in the case of an ordinary assignee, who is not required to pursue, much less exhaust collateral remedies. *Johnston* v. *Hackley,* 6 Munf. 449; *Caton* v. *Lenox,* 5 Rand. 41; *Harrison* v *Raines,* 5 Munf. 456.

After all these acts evincing unusual diligence, we repeat that even as unquestioned assignee in equity, Mr. Barton could not be—or rather the estate of his testator could not be charged with this loss. After leaving the conduct of this claim to the "discretion" of Mr. Barton, after his energetic effort to make it, it is illogical and unjust to criticise his conduct, if fair and reasonable, in the light of after events.

But it is contended by Mrs. Tuley, in her deposition, that had the suit against M. G. Harman on this injunction bond been prosecuted to judgment instead of taking on a compromise, his bond with A. W. Harman as his surety, even then (in 1875) the debt might have been saved. In answer to this, it is only neces-

sary to say that several gentlemen of Augusta county of large business experience, so situated as to understand M. G. Harman's affairs, testify, that under the circumstances, Mr. Barton's act in this respect was judicious and proper.

But Mrs. Tuley contends that this compromise was made without her knowledge or consent. It is, however, manifest that if Mr. Barton was the equitable assignee, as contended by her, he had the indisputable right to pursue any legal remedy known to him independently of her.

If she did not know this fact, it is passing strange, that when Harman had thus discharged his liability on the injunction bond, and suing to be subrogated to White's rights respecting this very claim, had, as well as Mrs. Tuley, a recovery against Chrisman's estate; and Mrs. Chrisman, administratrix, filed her bill of interpleader, Mrs. Tuley, a party thereto, should have answered that bill, and supported her answer by her affidavit; and not only so, but when the court below rejected her claim, went to the court of appeals. It requires more than ordinary credulity to believe she did not know of, direct and acquiesce in all these proceedings.

Coming now more directly to the above letters of Mr. Barton, and to determine their bearing upon this case, it is necessary to look at Mrs. Tuley's attitude, in respect to this Trussel-Coburn claim, in still another aspect touching the true state of things. The first of Mr. Barton's notes written to Mrs. Tuley, that of November 26th, 1877, especially the postscript thereto, discloses a significant fact, to-wit: that she was writing to Mr. Barton about this very claim, and we must presume taking not only a lively interest, as well she might, but asking information, and, perhaps, giving directions, for the note is in answer to one received from her, is produced in evidence by her, and in the very first sentence gives her important direct information about this claim, and then goes on and explains briefly how the money collected by him—part of it on this claim—had been applied by him.

In the same year, and evidently very soon after said first note was written, Mr. Barton rendered to her his account in detail, embracing the matters mentioned in his note to her. To neither of these acts of his did she then, or for years afterwards, intimate the least dissent, or even signify any ignorance of these matters.

There must have been very frequent and full conferences between Mrs. Tuley and Mr. Barton, in reference to the probability of making this debt, as positively testified to by him.

In the other letter or note of Mr. Barton, of date December 27th, 1880, we have evidence (again furnished by Mrs. Tuley), that he therewith sent her a statement of the amount of her debt due him, as executor, which, by reason of the interest accrued during this long litigation, amounted on that day to $5,422.60, which sum he considered insufficiently secured, and asked for the payment of part, or additional security to protect him as executor, but assuring her he did not want the money then, but only to be made safe.

Surely, after all his indulgence and effort in her behalf, he was entitled to this. Again, no objection is made by her. On the contrary, there is evidence of her acquiescence in this reasonable and just request. It is impossible to read together these two notes from Mr. Barton to Mrs. Tuley and conclude, especially in the light of all the attendant circumstances, that he spoke of this claim as assigned or transferred to him as collateral security in the strict legal sense of those terms; but that, on the contrary, he used them, as he says in his deposition, as a brief way of referring to his understanding that when collected this claim should be applied to the debt due him as executor.

But yet again : as late as the 7th day of January, 1881, and strikingly in support of the above view, Mrs. Tuley, through the Hon. Richard Parker, made to Mr. Barton the payment of $505 ; and not only so, but then promised to make other payments soon, or else give the security required. Thus Mr. Barton's view, as set forth not only in his deposition, but in his

said letters, has the unmistakable endorsation and approval of Mrs. Tuley herself. Surely nothing more could be necessary.

From a careful analysis of the whole case, we are of opinion that neither contemporaneously with his receipt therefor, nor subsequently, did R. T. Barton accept the Trussel-Coburn debt as collateral security for the debt due by Mrs. Tuley to him as executor of David W. Barton; but that some time after said receipt, it was agreed between them that the claim held by Mr. Barton, as Mrs. Tuley's attorney at law, should stand pledged, to be applied to Mrs. Tuley's debt to said estate, when collected. This being so the case in this respect is ruled by the case of *Richardson* v. *Ins. Co. Val. Va.*, 27 Gratt. 753.

As to the other question touching the ruling of the court below as to costs, very little need be said. The $505 payment is admitted. It clearly appears that there was no necessity for resorting to the court for obtaining this credit; and it would be gross injustice to give the costs to the appellant. *Donally* v. *Ginatt's Adm'r,* 5 Leigh, 391. The decree of the court below must be affirmed with costs to the appellee, which must be certified to the said circuit court of Frederick county.

LACY and FAUNTLEROY, Js., dissented.

DECREE AFFIRMED.